## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| **LAKESHORE SAIL CHARTERS, LLC,** | ) | |
| | ) | |
| **Plaintiff and** | ) | |
| **Counter-Defendant,** | ) | 14-cv-2410 |
| | ) | |
| **v.** | ) | **Judge John Z. Lee** |
| | ) | |
| **ACADIA INSURANCE COMPANY,** | ) | |
| | ) | |
| **Defendant and** | ) | |
| **Counter-Plaintiff.** | ) | |

## MEMORANDUM OPINION AND ORDER

This suit for breach of an insurance contract is brought under the Court's admiralty jurisdiction, 28 U.S.C. § 1333. Plaintiff Lakeshore Sail Charters, LLC, claims that Defendant Acadia Insurance Company breached its contract to insure Lakeshore against damage to a sailing vessel, the Halie & Matthew, and against any resulting lost earnings. Lakeshore further claims that Acadia acted in bad faith by refusing to honor the contract, entitling Lakeshore to additional compensation under Illinois law. Acadia retorts that it has fulfilled its obligations under the contract and that Illinois law does not apply.

Both sides have moved for summary judgment. Acadia also has moved to strike two affidavits Lakeshore submitted in support of its motion. For the reasons given below, the Court denies Acadia's motions to strike, and the motions for summary judgment are granted in part and denied in part. Judgment is granted in favor of Lakeshore as to its loss of earnings claim, but denied in all other respects.

# I. Factual Background[1]

Lakeshore Sail Charters, an Illinois company, acquired a 79-foot schooner named the Halie & Matthew with the intention of participating in various "tall ship" festivals in the Great Lakes during the summer of 2013. Pl.'s SOF ¶¶ 7; Pl.'s Ex. 1 (Affidavit of Karen Randall) ¶ 2. As a participating sailing vessel, the Halie & Matthew would have the opportunity to sell tickets for scheduled excursions. Pl.'s SOF ¶ 9; Pl.'s Ex. 1 (Randall Aff.). In advance of the festivals, Lakeshore purchased an insurance policy for the Halie & Matthew from an agent in Maine. Pl.'s SOF ¶ 3; Def.'s SOF ¶ 6. The policy, which went into effect on June 12, 2013, was issued by Acadia Insurance, a New Hampshire company. Pl.'s SOF ¶¶ 3, 12; Def.'s SOF ¶ 5.

The policy covered damage to the vessel while voyaging in the Great Lakes. Def.'s SOF ¶ 8. Lakeshore also purchased several endorsements from Acadia to expand the policy's coverage. *Id.* Three of the purchased endorsements are relevant to the claims in this case.

First, the Loss of Earnings Endorsement covered losses due to an interruption in business resulting from damage to the ship. Pl.'s SOF ¶ 13; Pl.'s Ex. 2 (Contract) at 30. "Loss of Earnings" is defined as "net profits and continuing expenses." *Id.* To make a claim under the Loss of Earnings Endorsement, the insured was required to submit a good faith estimate of its losses. Pl.'s Ex. 2 (Contract) at 30. The coverage amount under this endorsement was capped at

---

[1]     The following facts are undisputed except where noted. Any properly supported fact that a party disputes without "providing specific references to the affidavits, parts of the record, and other supporting materials relied upon," *see* LR56.1(b)(3)(B), is deemed admitted. *See Friend v. Valley View Cmty. Unit Sch. Dist. 365U,* 789 F.3d 707, 710 (7th Cir. 2015).

$250,000. Pl.'s SOF ¶ 30. The endorsement did not provide coverage "in the event the interruption in business is caused as a result of the suspension or termination of the insured's authority to operate by a governmental or regulatory body." Pl.'s Ex. 2 (Contract) at 30.

Second, the Medical Payments Endorsement expanded the policy's "Protection and Indemnity Clauses" to add "medical payments." This endorsement applied "to fare paying passengers only." Pl.'s SOF ¶ 15; Ex. 2 (Contract) at 33.

Finally, an untitled endorsement expanded the coverage of the policy from voyages in the Great Lakes to a "[o]ne time trip from Maine to Chicago." Def.'s SOF ¶ 9; Pl.'s Ex. 2 (Contract) at 36. The same endorsement also specified that "there is no coverage for fare paying passengers until a new COI is received and accepted by Acadia Insurance Company." *Id.* A COI is a certificate of inspection from the Coast Guard. *Id.* The parties agree that the Halie & Matthew had a certificate of inspection issued by the Coast Guard in Maine, *see* Pl.'s Additional Facts ¶ 13; Def.'s Resp. Pl.'s Additional Facts ¶ 13, but that the ship could not carry passengers after leaving Maine until it arrived in the Great Lakes and was authorized by the Coast Guard there, *see* Def.'s SOF ¶ 12; Pl.'s Resp. Def.'s SOF ¶ 12. According to Acadia, the Coast Guard in the Great Lakes would actually issue a new certificate, while Lakeshore contends that the existing certificate would simply be updated. Def.'s SOF ¶ 12; Pl.'s Resp. Def.'s SOF ¶ 12. (As will be seen, the distinction makes no difference.)

On June 28 or 29, 2013, while en route to the Great Lakes, the Halie & Matthew encountered bad weather and sustained significant damage to its bowsprit. Pl.'s SOF ¶ 10; Def.'s SOF ¶ 14. The ship could not continue to its destination before being repaired. Pl.'s SOF ¶ 11.

The repairs were begun in Quebec but had to be completed in New York. Def.'s SOF ¶ 14. According to Lakeshore, the time needed to complete the repairs caused the Halie & Matthew to miss most of the tall ship festivals it was scheduled to attend, causing a substantial financial loss. Pl.'s SOF ¶ 11; Pl.'s Ex. 1 (Randall Aff.) ¶6; Pl.'s Ex. 6 (Loss Estimate). Acadia disputes this statement, denying the sufficiency of the evidence offered in support. *See* Def.'s Resp. Pl.'s SOF ¶ 11.

Lakeshore submitted a claim to Acadia for costs related to the ship's repair. The claim sought $100,700.64. Pl.'s SOF 35. Acadia approved payment in the amount of $63,661.86, but denied the remainder of the claim. Def.'s SOF ¶ 31.

Lakeshore also submitted a claim under the Loss of Earnings Endorsement for the profits it had anticipated from the tall ship festivals it missed. Pl.'s SOF ¶¶ 24–25; Pl.'s Ex. 1 (Randall Aff.) ¶ 12; Pl.'s Ex. 6 (Loss Estimate). In support of that claim, Lakeshore provided a detailed estimate of its lost earnings along with copies of the "appearance agreements" it had executed with festival organizers. *Id.* Those agreements provided the schedules for those festivals and division of ticket-sale revenues between Lakeshore and the festival organizers. *Id.*

Lakeshore calculated its anticipated profits from ticket sales at the four festivals by multiplying its share of each ticket sale by an estimated number of

passengers for each event and then subtracting estimated crew and fuel costs. *Id.* Lakeshore explained that it estimated the number of passengers who would have bought tickets for excursions on the Halie & Matthew based on reports from festival organizers of the percentage of tickets sold by the ships that did participate. *Id.*

Lakeshore estimated its net profits at $385,000. *Id.* In compiling that estimate, Lakeshore included only four of the five festivals it missed and did not include an estimate of "continuing expenses" because the estimated net profits from the first four festivals far exceeded the policy cap of $250,000. *Id.* Lakeshore invited Acadia to forward any information that it believed would affect that estimate. *Id.*

Acadia denied Lakeshore's loss of earnings claim entirely, contending that the Loss of Earnings Endorsement was not in effect at the time of the accident because the Halie & Matthew had not yet obtained a new certificate of inspection from the Coast Guard in the Great Lakes. *Id.* ¶ 28; Pl.'s Ex. 9 (Denial Letter of 11/26/13). Faced with the denial, Lakeshore filed this lawsuit, bringing two claims for breach of contract and one for a statutory penalty and damages under 215 Ill. Comp. Stat. § 5/155. Acadia in turn filed a counterclaim seeking a declaratory judgment that it is not liable to Lakeshore. Both parties have moved for summary judgment on Lakeshore's claims. Acadia also has moved to strike two affidavits by Karen Randall, Lakeshore's owner.

## II. Legal Standard

When deciding a motion under Federal Rule of Civil Procedure 56 for summary judgment, the Court views the evidence in the light most favorable to the

non-moving party. *Shell v. Smith*, 789 F.3d 715, 717 (7th Cir. 2015). The motion will be granted if there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law. *Id.* Rule 56 "requires the district court to grant a motion for summary judgment after discovery 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Silverman v. Bd. of Educ. of City of Chi.*, 637 F.3d 729, 743 (7th Cir. 2011) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

## III. Analysis

### A. Motions to Strike

Lakeshore submitted an affidavit and supplemental affidavit from Karen Randall, the "sole managing member of Lakeshore Sail Charters, LLC," in support of its motion for summary judgment. *See* Ex. 1 to Pl.'s SOF; Ex. 1 to Pl.'s Additional Facts. Acadia moves to strike these affidavits on the ground that they do not comply with Fed. R. Civ. P. 56(c)(4), which requires that affidavits "used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." *See Boyce v. Moore*, 314 F.3d 884, 889 (7th Cir. 2002) (affidavits "must set forth facts that would be admissible in evidence").

Acadia's specific objections are aimed at Randall's statements concerning Lakeshore's claim for loss of earnings. According to Acadia, Randall does not provide sufficient documentation to support the loss estimates she provides. See

Def.'s Mot. Strike Randall Aff. at 3–4 [ECF 49]; Def.'s Mot. Strike Supplemental Aff. at 2–3 [ECF 58].

The Court disagrees. Randall's account of Lakeshore's lost profits is a description of the claim her company submitted to Acadia, and that detailed claim, along with the appearance agreements supporting it, are in the record. *See* Pl.'s Ex. 1 (Randall Aff.) ¶ 12; Pl.'s Ex. 6 (Loss Estimate). Randall, as the sole managing member of Lakeshore, is competent to testify that her company submitted such a claim to Acadia, and business owners are permitted to testify about expected profits. *See Echo, Inc. v. Timberland Machines & Irr., Inc.*, 661 F.3d 959, 965 (7th Cir. 2011) ("As the advisory committee notes to Rule 701 explain, a business owner or officer is allowed to testify 'to the value or projected profits of the business, without [being qualified] as an accountant, appraiser, or similar expert' where that testimony is based on the 'particularized knowledge that the witness has by virtue of his or her position in the business.'").

Accordingly, Acadia's motions to strike are denied. This is not to say that each of Randall's statements constitutes an undisputed fact—or even a fact at all. The Court will disregard legal conclusions in her affidavits, as well as any factual statements that are too vague or conclusory to have evidentiary value.

## B. Choice of Law

The insurance contract in this case did not include a choice-of-law provision. Acadia argues that Maine law should apply, and Lakeshore argues that Illinois law

should apply. This Court is sitting in admiralty, and the Seventh Circuit has explained that

> a federal court sitting in admiralty can, by analogy to the practice of the federal courts in regard to federal common law (which is to say nonadmiralty federal judge-made law), borrow the law of a state or a foreign country to resolve a dispute that had come into court under the admiralty jurisdiction, especially when dealing with a subject traditionally regulated by the states, such as insurance (including marine insurance).

*Cont'l Cas. Co. v. Anderson Excavating & Wrecking Co.*, 189 F.3d 512, 519 (7th Cir. 1999). But before borrowing a state law, a federal court "must ask whether there is admiralty law on the issue and if so it must apply that law and if not it must decide whether the interest in uniformity should trump the state's regulatory interest and expertise." *Id.*

In *Continental Casualty*, the court found that admiralty law existed on the interpretation of the particular contract provision at issue (the "Inchmaree Clause"). 189 F.3d at 519–20. In this case, the parties cite no admiralty law guiding the interpretation of the contract provisions at issue, and the Court finds none. The Court will therefore apply state-law interpretive rules, choosing which state's law to apply based on federal choice-of-law rules.

The federal choice-of-law inquiry in marine contract cases asks which state has the "greatest interest" or "most significant relationship" to the dispute. *Albany Ins. Co. v. Anh Thi Kieu*, 927 F.2d 882, 891 (5th Cir. 1991); *Lien Ho Hsing Steel Enter. Co. v. Weihtag*, 738 F.2d 1455, 1458 (9th Cir.1984); *Ill. Constructors Corp. v. Morency & Assocs., Inc.*, 802 F. Supp. 185, 188 (N.D. Ill. 1992). As Acadia

acknowledges, *see* Def.'s Resp. Br./Mem. Supp. at 1 n.1, whether the Court borrows from Maine or Illinois is inconsequential when it comes to rules governing contract interpretation or the allocation of burdens because those rules are essentially the same in both states.

The choice, however, is potentially important for Lakeshore's claim under 215 Ill. Comp. Stat. § 5/155 for attorneys' fees and statutory damages. And the Court concludes that, on balance, Illinois law rather than Maine law should apply. Although the contract was executed in Maine and the Halie & Matthew was in Maine at the time, Lakeshore is based in Illinois, and Acadia chose to insure the vessel for a "trip from Maine to Chicago" as well as voyages in the Great Lakes. Under these circumstances, the Court finds that Illinois has the greatest interest in this dispute.

This determination, however, does not conclusively decide whether § 5/155 can be "borrowed" in an admiralty case. Neither party has briefed whether admiralty law exists on the subject, and in fact there is a circuit split concerning whether state laws providing for attorneys' fees and/or statutory damages for vexatious and unreasonable conduct by the insurer can be applied in admiralty insurance coverage cases. The Court will return to this subject when analyzing Lakeshore's claim under § 5/155 below.

## C. Breach of Contract - Loss of Earnings Claim

Lakeshore claims that Acadia breached the insurance contract by not honoring the Loss of Earnings Endorsement. *See* Compl. ¶¶ 29–36. According to

Lakeshore, Acadia was obliged to pay Lakeshore for the estimated net profits it would have realized from the tall ship festivals had the Halie & Matthew not been damaged. Pl.'s Mem. Supp. at 8–12. Lakeshore contends that the contract unambiguously obligates Acadia to compensate it for these losses and further contends that that those losses indisputably far exceed the $250,000 cap. *Id.*

For its part, Acadia argues that the Loss of Earnings Endorsement was not actually in effect at the time of the accident because the untitled endorsement specifies that "there is no coverage for fare paying passengers until a new COI is received and accepted by Acadia Insurance Company." Def's Resp. Br./Mem. Supp. at 3–5. According to Acadia, this language means that the Loss of Earnings Endorsement did not apply at the time of the accident because Lakeshore had not yet reached the Great Lakes and obtained a new certificate of inspection. *Id.* Under Acadia's proposed reading of the contract, "no coverage for fare paying passengers" means no reimbursement for lost ticket sales. *Id.*[2]

Lakeshore counters that the "fare paying passenger" language in the untitled endorsement refers to the Medical Coverage Endorsement, which also uses the term "fare paying passengers," and not to the Loss of Earnings Endorsement, which does not. Pl.'s Mem. Supp. at 9–10; Pl.'s Reply/Resp. Br. at 4–5. Lakeshore also points out that the Loss of Earnings Endorsement covers "continuing expenses" in addition

_____

[2] It is unclear whether Acadia also is attempting to argue that the Loss of Earnings Endorsement does not apply because Lakeshore had not commenced operating its business in the first place prior to arriving at the Great Lakes and obtaining the COI. If so, Acadia presents no facts to support such an argument, and all facts in the record are to the contrary. Pl.'s Ex. 1 (Randall Aff.) ¶12 ; Pl.'s Ex. 6 (Appearance Agreements).

to "net profits," making Acadia's reading of the untitled endorsement as a limitation on the Loss of Earnings Endorsement even less tenable. Pl.'s Mem. Supp. at 10–11.

Under Illinois law, "unambiguous" contract provisions "will be enforced as written." *Berrey v. Travelers Indem. Co. of Am.*, 770 F.3d 591, 595 (7th Cir. 2014). "A policy will be considered ambiguous only where its language is subject to more than one reasonable interpretation." *Id.* Whether an ambiguity exists is a question of law. *Int'l Union v. ZF Boge Elastmetall LLC*, 649 F.3d 641, 649 (7th Cir. 2011).

The Court agrees with Lakeshore that the untitled endorsement is unambiguous and is not a limitation on the Loss of Earnings Endorsement. The "no coverage for fare paying passengers" language in the untitled endorsement clearly was intended to echo the "fare paying passengers" language contained in the Medical Payments Endorsement, which provides coverage for certain medical payments for "fare paying passengers only." Furthermore, the Loss of Earnings Endorsement covers a "loss of earnings," that is, the lack of fare paying passengers, while the untitled endorsement envisions coverage *for* fare paying passengers once a CIO is received. Indeed, to fit Acadia's construction, the endorsement would have to read "there is no coverage for *the absence of* fare paying passengers until a new COI is received." Had Acadia wanted to include such a limitation on the Loss of Earnings Endorsement, it easily could have done so, but the absence of such a provision speaks volumes.

Acadia next argues that the Loss of Earnings Endorsement was not in effect at the time of the accident because the endorsement specifies that "no coverage will

apply in the event the interruption of business is caused as a result of the suspension or termination of the insured's authority to operate by a governmental or regulatory body." Def's Resp. Br./Mem. Supp. at 6–7. According to Acadia, this provision applies because the Halie & Matthew had not been yet been cleared by the Coast Guard to carry passengers in the Great Lakes. *Id.*

This argument too is refuted by the unambiguous words in the policy. The exclusion requires two things: (1) a "suspension or termination" that (2) causes an interruption in business. As to the first requirement, Acadia provides no evidence that a governmental or regulatory body had suspended or terminated the Halie & Matthew's authority to operate its business prior to the accident. Taking the evidence in the light most favorable to Acadia, the ship was required to get a new certificate of inspection from the Coast Guard once it arrived in the Great Lakes, but this requirement, which was apparently a matter of course, cannot be understood as a suspension or termination of the Halie & Matthew's authority to do business.

What is more, Acadia concedes that Lakeshore had a valid certificate of inspection in place for the journey from Maine to the Great Lakes when the accident took place, *see* Def.'s Resp. Pl.'s Additional Facts ¶ 13, and also concedes that Lakeshore could not have obtained the certificate required for carrying passengers in the Great Lakes prior to arriving in the Great Lakes, *see* Def.'s Reply Br. at 6 ("Lakeshore could not operate as a charter business in the Great Lakes until it had reached the Great Lakes, obtained a new Certificate of Inspection ('COI'), provided

that COI to Acadia and had it accepted by Acadia."). Moreover, Acadia does not suggest that the Halie & Matthew would have had any difficulty obtaining the required certificate as soon as it arrived at the Great Lakes had the accident not occurred. And, in fact, it is undisputed that the ship obtained the certificate once the damage from the accident was repaired. Def.'s SOF ¶ 16.

As to the second requirement, Lakeshore's position is that it was the damage the Halie & Matthew sustained that caused it to miss the tall ship festivals, not a suspension or termination by a governmental authority. Pl.'s SOF ¶ 11; Pl's Ex. 1 (Randall Aff.) ¶ 6. Acadia purports to dispute this fact, but does so only by challenging the sufficiency of Lakeshore's evidence—the Randall affidavit—and by demanding "strict proof thereof." *See* Def.'s Resp. Pl.'s SOF ¶ 11. But Randall's affidavit constitutes admissible evidence on why her ship was unable to participate in the tall ship festivals. And demanding proof of a fact does not dispute it. *See Fed. Deposit Ins. Corp. v. Meyer*, 781 F.2d 1260, 1267 (7th Cir. 1986) (holding a demand for "'strict proof thereof'" in response to a Rule 56 statement of fact "is insufficient to raise a genuine issue of material fact.").

Acadia's final argument is that it did not need to pay Lakeshore for lost earnings because Lakeshore had not provided sufficient proof of its loss. Def's Resp. Br./Mem. Supp. at 7–10. But the Loss of Earnings Endorsement required Lakeshore to provide only a good-faith estimate. *See* Pl.'s Ex. 2 (Contract) at 30. Acadia could then inspect the insured's records during normal business hours if it was "not satisfied with the estimates." *Id*. Lakeshore even invited Acadia to suggest

alterations to the estimate if it believed alterations were needed. *See* Pl.'s Ex. 6 (Loss Estimate). Rather than exercise these options, Acadia just denied the claim. Pl.'s Ex. 9 (Denial Letter).

Nor has Acadia put forward any evidence that Lakeshore's estimate was not made in good faith or that any necessary adjustment to the estimate would bring Lakeshore's damages below the $250,000 cap. Acadia argues that Lakeshore's estimate exaggerated the number of tickets it would have sold, citing to the deposition testimony of Bruce Randall, Karen's husband, who explained that they had anticipated that all tall ship festivals would sell out but that a festival the Halie & Matthew attended *after* it was repaired did not. *See* Def.'s Resp. Br/Mem. Supp. at 8 n.6. Acadia, however, failed to reference these statements in its Rule 56.1 Statement of Facts, and, in any event, the testimony does not actually undermine the loss estimate Lakeshore submitted. The estimate explained that three festivals sold out according to organizers and that a fourth festival reportedly sold only 80% of its tickets. *See* Pl.'s Ex. 6 (Loss Estimate). This is not inconsistent with Bruce Randall's testimony.

Acadia also argues that Lakeshore should have subtracted additional expenses from the gross revenues it calculated, but it points to no evidence to support this argument. *See* Def.'s Resp. Br./Mem. Supp. at 9. Finally, Acadia complains that Lakeshore did not comply with discovery requests for information on its losses, *see* Def.'s Reply Br. at 10, but the time to litigate discovery disputes is before discovery closes, not in response to a motion for summary judgment.

In short, there is no genuine dispute of material fact as to this claim, and Lakeshore is entitled to judgment as a matter of law with respect to its loss of earnings claim. Lakeshore has presented evidence of damages far exceeding the $250,000 cap under the Loss of Earning Endorsement, and Acadia has offered no alternative calculation supported by evidence that could bring that figure below the cap. The Court therefore awards Lakeshore $250,000.

## D. Breach of Contract – Hull Repair Claim

Lakeshore claims that Acadia also breached the insurance contract by not fully reimbursing Lakeshore for covered repair costs. According to Lakeshore, Acadia still owes $37,039. The bulk of that amount—$27,538.94—is for crew costs. *See* Pl.'s SOF ¶ 35; Def.'s SOF ¶ 31. The remaining roughly $9,500 is for "travel," "bank fees," and "additional charges." Pl.'s SOF ¶ 35.

Acadia first argues that the insurance policy did not cover the disputed crew costs. Def.'s Resp. Br./Mem. Supp. at 11. Acadia did pay Lakeshore $3442.37 in crew costs to cover the crew's wages for moving the ship for necessary repairs, *see* Pl.'s SOF ¶35; Def.'s SOF ¶ 31, but it denied coverage as to the remainder, Def.'s SOF ¶ 26. Acadia points to this provision in support of its denial:

> No claim shall be allowed in particular average for wages and maintenance of the Master, Officers or Crew, except when incurred solely for the necessary removal of the Vessel from one port to another for average repairs or for trial trips to test average repairs, in which cases wages and maintenance will be allowed only while the Vessel is under way. This exclusion shall not apply to overtime or similar extraordinary payments to the Master, Officers or Crew incurred in shifting the Vessel for cleaning or

> repairs or while specifically engaged in these activities,
> either in port or at sea.

*Id.* ¶ 24; Def.'s Resp. Br./Mem. Supp. at 11.

Lakeshore does not address this provision in responding to Acadia's argument. Instead, Lakeshore counters that the crew costs it seeks should be covered as "continuing expenses" under the Loss of Earnings Endorsement. Pl.'s Resp. Br./Reply Br. at 11–12; Resp. to Def.'s SOF at ¶ 24. But even if Lakeshore were correct that crew costs qualify as "continuing expenses" under that endorsement, Lakeshore's lost profits alone exceed the endorsement's cap, and any additional amounts would not be recoverable.

As to the remaining $9,500, Acadia argues that Lakeshore has not met its burden of putting forward evidence to establish that those costs were covered under the policy. Acadia, relying on the affidavit of the adjuster who handled Lakeshore's claims, states that the "Bank Fees and Travel Fees were not directly related to the repair of the Vessel so as to be covered by the Policy." Def.'s SOF ¶ 27; Def.'s Ex. A (Affidavit of Lisa Briggs). Lakeshore disputes this fact, stating that the "costs were directly related to the repairs," citing to Randall's affidavit. Pl.'s Resp. Def's SOF ¶ 27.

The Court agrees that Lakeshore's evidence does not create a genuine dispute of material fact on this point. Neither of Randall's affidavits explains how the "travel," "bank fees," and "additional charges" were connected to the repair efforts. Lakeshore contends that it "provided a detailed affidavit of Karen Randall which specified the costs that were being sought, the reasons those costs were incurred in

connection with the repair efforts and the plan for coverage relating thereto." Pl.'s Resp. Br./Reply Br. at 11. But in reality she merely asserts in her affidavit that "Lakeshore's expenses were as follows" and then lists those line items without further explanation. *See* Pl.'s SOF, Ex. 1 (Randall Aff.) ¶¶ 20–21. In Illinois, "the burden is on the insured to prove that its claim falls within the coverage of an insurance policy." *Addison Ins. Co. v. Fay*, 905 N.E.2d 747, 752 (Ill. 2009). Because Lakeshore's evidence would not allow it to meet that burden at trial, the Court grants Acadia's motion for summary judgment on Count II. *See Silverman*, 637 F.3d at 743 (explaining that summary judgment is appropriate when nonmoving party's evidence could not meet its burden at trial).

## E. Count III – Claim for "Consequential Damages"

As discussed, the Court concludes that Illinois has the most significant connection to this dispute. But whether state laws such as 215 Ill. Comp. Stat. § 5/155, which allows for recovery of attorneys' fees and/or statutory damages, can be applied in an admiralty case—and specifically in an admiralty case concerning insurance coverage—is another matter. The Seventh Circuit has not spoken on the issue, and the circuits that have spoken are split. *Compare Am. Nat. Fire Ins. Co. v. Kenealy,* 72 F.3d 264, 270 (2d Cir. 1995) (rejecting application of New York state law on attorneys' fees in a maritime insurance case), *with INA of Tex. v. Richard*, 800 F.2d 1379, 1381 (5th Cir. 1986) (allowing state law fee shifting in marine insurance cases); *Misener Marine Const., Inc. v. Norfolk Dredging Co.*, 594 F.3d 832, 839–42 (11th Cir. 2010) (concluding that Georgia's attorneys' fees statute could not

be applied in admiralty contract case but distinguishing insurance contracts); and *Southworth Mach. Co. v. F/V Corey Pride*, 994 F.2d 37, 41–42 (1st Cir. 1993) (holding in contract case that Massachusetts attorneys' fees provision was inconsistent with federal admiralty law but distinguishing insurance contracts).

Other cases have held that a court sitting in admiralty has the equitable discretion to award attorney's fees when a party to a contract acted in bad faith. *See, e.g.*, *Sosebee v. Rath*, 893 F.2d 54, 56–57 (3d Cir. 1990) (rejecting application of Virgin Islands attorney's fees law but stating that attorneys' fees are available in admiralty cases if "the court determines in its equitable discretion that one party has acted in bad faith"); *Ingersoll Mill. Mach. Co. v. M/V Bodena*, 829 F.2d 293, 309 (2d Cir. 1987) ("[T]he general rule is that the award of fees and expenses in admiralty actions is discretionary with the district judge upon a finding of bad faith.").

Finally, two courts in this district have found § 5/155 applicable in admiralty cases. *See Great Lakes Dredge & Dock Co. v. Commercial Union Assur. Co.*, No. 94 C 2579, 2000 WL 1898533, at \*\*10–12 (N.D. Ill. Sept. 18, 2000); *Perzy v. Intercargo Corp.*, 827 F. Supp. 1365, 1367 (N.D. Ill. 1993).

Whether § 5/155 can be properly applied in an admiralty case need not be decided in this case, however, because the Court concludes that, even if the provision were to apply here, Lakeshore falls short of satisfying its requirements. Section 5/155 permits recovery if "it appears to the court" that an insurer's denial of a claim or delay in paying was "vexatious and unreasonable." 215 Ill. Comp. Stat.

§ 5/155. This is a question of law for the Court, *see Johnson v. Safeco Ins. Co.*, 809 F. Supp. 602, 608 (N.D. Ill. 1992), affirmed 9 F.3d 112 (7th Cir. 1993), and the evidence in this case, viewed in the light most favorable to Lakeshore, cannot establish its entitlement to recovery under the statute.

Lakeshore's main argument is that Acadia's interpretation of the Loss of Earnings Endorsement was wrong. But no recovery is permitted under § 5/155 if there was "a bona fide dispute concerning the scope and application of insurance coverage." *TKK USA, Inc. v. Safety Nat. Cas. Corp.*, 727 F.3d 782, 793 (7th Cir. 2013) (citation omitted). And, while Acadia's construction of the contract was incorrect, its reading was not completely out of bounds or foreclosed by prior authority. The Court thus concludes that there was a bona fide dispute as to coverage here. *See id.* (concluding that a dispute was bona fide because it raised a matter of first impression).

Lakeshore also contends that it is entitled to recovery under § 5/155 on the basis that Acadia took an excessively long time to pay its hull repair claim. As evidence that Acadia was not negotiating that claim in good faith, Lakeshore points to a lawsuit Acadia filed in the District of Maine seeking a declaratory judgment that it was not liable for Lakeshore's claim under the Loss of Earnings Endorsement. Pl.'s Mem. Supp. at 14; Pl.'s SOF 29; *see Acadia Ins. Co. v. Lakeshore Sail Charters, LLC*, No. 13-cv-00459-GZS (D. Me.).[3] Lakeshore notes that Acadia filed the suit shortly after denying the Loss of Earning claim but failed to inform

---

[3]     The Maine case was ultimately transferred to the Northern District of Illinois as Case No. 14-cv-9918 and voluntarily dismissed by Acadia.

Lakeshore of the lawsuit for several months while the parties continued to negotiate the hull repair claim. Pl's SOF ¶¶ 28–29; see *Acadia Ins. Co.*, No. 13-cv-00459-GZS, Doc. 6 (granting Acadia's motion to extend time to serve complaint). Although Lakeshore may have been surprised by the lawsuit given that it was attempting to negotiate the related hull repair claim with Acadia at the time, the Court does not believe that Acadia's filing of the Maine lawsuit in and of itself is evidence of bad faith, particularly when it did so only after denying the lost earnings claim.

Finally, Lakeshore also notes that "[f]or reasons unknown, Acadia's first marine surveyor refused to communicate with Lakeshore" and that the second surveyor made a low-ball settlement offer. Pl.'s SOF ¶¶ 33–34. Entirely absent, however, is any clear statement of how long it actually took Acadia to pay the claim and why the delay was unreasonable when compared to similar circumstances. Furthermore, it is undisputed that Acadia did pay a total of $17,500 on the claim between July and August 2013. *See* Def.'s SOF ¶ 22; Def.'s Ex. A (Briggs Aff.) ¶ 7. Without evidence that any delay paying the remainder was unreasonable, the Court could not find for Lakeshore on this claim.

As a final point, although Lakeshore's complaint seeks as relief "an award of a statutory penalty and damages" as well as attorney's fees, its motion only seeks "consequential damages" totaling $150,000: $100,000 for a down payment made for renting the vessel, and $50,000 for "additional investment for equipment in order to outfit the vessel or excursions." Pl.'s Ex. 1 (Randall Aff.) ¶ **23.** 215 Ill. Comp. Stat. § 5/155(1) provides:

> [T]he court may allow as part of the taxable costs in the action reasonable attorney's fees, other costs, plus an amount not to exceed any one of the following amounts:
>
> (a) 60% of the amount which the court or jury finds such party is entitled to recover against the company, exclusive of all costs;
>
> (b) $60,000;
>
> (c) the excess of the amount which the court or jury finds such party is entitled to recover, exclusive of costs, over the amount, if any, which the company offered to pay in settlement of the claim prior to the action.

Rather than tethering its claim to these elements and explaining why the amount it seeks is appropriate, Lakeshore requests $150,000 in "consequential damages" based on nothing more than bald assertions of loss by Karen Randall. This is insufficient to establish a claim under this section.

For all of these reasons, summary judgment is granted to Acadia as to Count III.

### III. Conclusion

For the reasons given above, the Court grants Lakeshore's motion for summary judgment [47] on the Loss of Earnings contract claim in the amount of $250,000. The Court denies Lakeshore's motion as to the Hull Repair claim and its claim under 215 Ill. Comp. Stat. § 5/155. The Court denies Acadia's motion for summary judgment [52] on Lakeshore's Loss of Earnings contract claim but grants it on the other two claims. Acadia's motions to strike [49, 50] are denied, and Acadia's Counterclaim [27] is dismissed at moot. Judgment is entered in favor of Lakeshore and against Acadia in the amount of $250,000.

**SO ORDERED**                    ENTER:   3/7/16

_____
**JOHN Z. LEE**
**United States District Judge**